USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _11/12/13_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

LABORATORIOS RIVAS, SRL,                    :        REPORT AND
                                            :        RECOMMENDATION
                                            :
                            Plaintiff,      :        11 Civ. 5980 (RA) (JLC)
            -v-                             :
                                            :
UGLY & BEAUTY, INC., et al.,                :
                                            :
                            Defendants.     :

---------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

**To The Honorable Ronnie Abrams, United States District Judge:**

Plaintiff Laboratorios Rivas, SRL ("Plaintiff") brings this trademark action against

multiple defendants, all of whom have now settled or been dismissed on consent except for

defendant Juan U. Vargas ("Vargas"), who is in default. Plaintiff's suit seeks, inter alia, seizure

of counterfeit hair care products bearing its trademarks and trade dress, as well as statutory

damages, costs and attorneys' fees, and a permanent injunction. Vargas has failed to answer or

otherwise respond to the lawsuit. Plaintiff now seeks a default judgment against Vargas,

encompassing: a permanent injunction; statutory damages in the amount of $360,000; attorneys'

fees in the amount of $41,565; and costs in the amount of $21,699.79 (including the fees of a

private investigator). As set forth below, I recommend that the Court grant the motion for

default judgment, with certain modifications to the relief sought discussed herein.[1]

---

[1] Notwithstanding the fact that Plaintiff and the non-defaulting defendants consented to my
jurisdiction over this case pursuant to 28 U.S.C. § 636(c) (Dkt. No. 62), the decision on
Plaintiff's motion for default will be in the form of a Report and Recommendation because
Vargas, the defaulting party, has not consented to my jurisdiction. See, e.g., Jack Taylor
Engineering Co. v. Colfax Corp., 2011 WL 384614, at *4 (W.D. Tenn. Feb. 3, 2011) (magistrate
judge lacked statutory authority to enter default judgment absent consent of defaulting party);

USDC SDNY
DATE SCANNED___ _11/12/13_

## I.   BACKGROUND

It is well-settled that a defendant who fails to answer or otherwise oppose a complaint is "deemed to have admitted all well-pleaded allegations in the complaint pertaining to liability." Finkel v. Romanowicz, 577 F.3d 79, 81 n.1 (2d Cir. 2009) (citing Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992)).  Accordingly, the following facts, which are drawn from Plaintiff's second amended complaint ("SAC"), Plaintiff's motion for default judgment, and the documentary evidence attached thereto, see Fed. R. Civ. P. 10(c), are established for the purpose of determining Vargas's liability.

### A.   Factual Background

Plaintiff is in the business of manufacturing, marketing, and selling various hair care products under the federally owned trademarks "Avanti" and "Silicon Mix and Design." (SAC ¶¶ 19, 22-23) (Dkt. No. 48).  In 1984, Plaintiff began manufacturing a line of hair care products in the Dominican Republic under the trademark Avanti.  (SAC ¶ 20).  In or about January of 2001, Plaintiff began manufacturing another line of hair care products under the trademarks Silicon Mix and Avanti.  (Id.).  In February of 2001, Plaintiff began exporting Silicon Mix products to the United States for sale.  (Id.).  Plaintiff's products are sold in the United States both through distributors and via the internet.  (SAC ¶¶ 20-21).  The Silicon Mix hair care products "are marketed to an ethnic market, and are popular with persons of ethnicities with characteristically dry, brittle hair, in particular the Dominican hair care market."  (SAC ¶ 26).

---

Victoria's Secret Stores v. Artco Equipment Co., 194 F. Supp. 2d 704, 715 (S.D. Ohio 2004) (default judgment motion is dispositive and magistrate judge may only issue recommended dispositions with respect to such a motion); see generally New York Chinese TV Programs, Inc. v. U.E. Enters., Inc., 996 F.2d 21, 25 (2d Cir. 1993) (absent consent, magistrate judge not authorized to issue final order).

Plaintiff has devoted significant resources to the marketing and promotion of its hair care products in the United States. (Id.). Net sales for Plaintiff's products have increased from approximately $305,000 in 2005-06, to $1.025 million in 2008-09, to approximately $1.47 million in 2010-11. (SAC ¶ 27). The wholesale, per unit cost of Silicon Mix hair product is approximately $2.33. (Id.). The product retails for approximately $4.99 for an 8 oz. container. (SAC ¶ 55). Plaintiff packages its hair care products in distinctive white containers with labels featuring the stylized presentation of the Silicon Mix trademark, as well as the Avanti trademark. (SAC ¶ 25). Products bearing these trademarks have come to be known as high quality by United States consumers of hair care products, and the trade dress and good will associated with the Silicon Mix products are greatly valued by Plaintiff. (SAC ¶ 28).

In or around June of 2010, Castillo Distributors, Inc., ("Castillo") – one of Plaintiff's largest distributors in the United States – informed Plaintiff that members of its sales team had become aware that counterfeit Silicon Mix products were being sold, often side by side with Plaintiff's product, at various retail vendors in New York and New Jersey. (SAC ¶ 29). Many of these vendors were longstanding purchasers of Plaintiff's products. (Id.).

After learning this news, Plaintiff's president, Sigmundo Rivas, traveled to the United States to meet with Castillo. (SAC ¶ 30). During his visit, Rivas visited a beauty supply store where he purchased, for $3.29, an 8 oz. container of what appeared to be the Silicon Mix intensive hair treatment product. (Id.). The packaging of this product was "a near-exact replica" of Plaintiff's product packaging. (Id.). It identified Plaintiff as the source of the product and provided Rivas's personal email address, and included the URL for Plaintiff's website as well as an exact copy of Plaintiff's UPC bar code. (Id.). However, upon closer inspection, Rivas was able to detect certain small differences between the two products that, while perhaps not "readily

3

apparent to the average consumer," allowed him to determine the product being sold was counterfeit. (SAC ¶¶ 30-31). Specifically, he noticed differences in the product quality, container markings, and label coloring and application, as well as the fact that the counterfeit product lacked lot numbers. (SAC ¶ 31). The odor of the counterfeit product was also different than the scent of Plaintiff's product. (Id.). Plaintiff later performed quality control tests on the counterfeit product, which revealed it was ineffective in conditioning and smoothing dry hair, the intended purpose of Plaintiff's product. (Id.).

In or about September 2010, Plaintiff hired the investigative firm of Michael G. Kessler & Associates, Ltd., d/b/a Kessler International ("Kessler") to investigate the counterfeiting scheme. (SAC ¶ 33).[2] Between September and December of 2010, Kessler purchased multiple counterfeit products from various retail and internet locations. (SAC ¶ 34). Despite diligent efforts, Kessler was unable to discern the source and manufacturer of the counterfeit products and retailers were either unable or unwilling to disclose their sources. (SAC ¶¶ 33-40).

Since approximately July 2010, Plaintiff has experienced a decline in sales in its Silicon Mix intensive hair treatment products in the New York and New Jersey metropolitan area. (SAC ¶ 32). Although in late 2010 or early 2011, Castillo salespeople reported a decline in counterfeit goods at several retail locations (SAC ¶ 41), between February and June of 2011, sales of the counterfeit products had again begun to escalate. (SAC ¶ 43). Castillo sales representatives continued their attempts to ascertain the source of the counterfeit products, but only one retailer provided a lead on a possible source, and Plaintiff's investigation into that lead proved futile. (Id.). Overall, Plaintiff's employees, agents, and investigators determined that

---

[2] There are two paragraphs numbered as 33 in Plaintiff's Second Amended Complaint.

4

counterfeit products were being sold in at least 18 distinct sales outlets,[3] including one internet

supplier.  (Plaintiff's Memorandum of Law in Support of a Default Judgment for Statutory

Damages Under 15 U.S.C. § 1117(c), Permanent Injunction, Fees, and Costs ("Pl. Mem.") at 4)

(Dkt. No. 74).[4]  The counterfeit product has been sold for as little as $1.99 per 8 oz. container.

(SAC ¶ 55).

### B.    Procedural Background

Plaintiff filed its original complaint on August 25, 2011.  (Dkt. No. 1).  Plaintiff then

amended its complaint on March 23, 2012, at which time Vargas was first named as a defendant.

(Dkt. No. 29).  Plaintiff filed a second amended complaint on August 13, 2012.  (Dkt. No. 48).

On September 24, 2012, Plaintiff sought an extension of time to serve Vargas with the second

amended complaint and permission to effect service using the alternative method of certified

mail.  (Dkt. No. 55).  Plaintiff's requests described its multiple good faith attempts to serve

Vargas and explained that Vargas was aware of the lawsuit pending against him.  (Dkt. No. 56).[5]

---

[3] As further discussed below (see infra at 21, n. 10), it is not clear to the Court that counterfeit products were in fact found at 18 different sales outlets.

[4] Plaintiff's memorandum of law, along with several other documents submitted by Plaintiff, is not independently paginated.  Accordingly, when referring to information in such documents, the Court will cite to the ECF page number.

[5] Plaintiff's Memorandum in Support of its Motion for an Extension of Service Time and for Alternate Service ("Pl. Service Mem.") (Dkt. No. 56) explains that Plaintiff's counsel located a business address for Vargas that "was listed in a bill of lading from 2007 which documents Mr. Juan Vargas receiving a shipment from China," and was provided by Vargas "as his contact address in a domain name registration and UDRP dispute."  Pl. Service Mem., at 6.  The address "also surfaced in an independent investigation conducted by Plaintiff."  (Id.).  Although Plaintiff was unable to effect personal service at that address, "Plaintiff's counsel mailed an envelope addressed to Mr. Juan Vargas, certified mail, return receipt requested," to the address and "receipt was returned to counsel two days later, signed and stamped, verifying that [Vargas] receives mail at this address."  (Id.).  Plaintiff's memorandum further states that "Plaintiff has been advised by his New Jersey distributor that Mr. Vargas is well aware that he has been sued, as he personally visited Plaintiff's local distributor and asked them to persuade Plaintiff to withdraw the suit against [him]."  (Pl. Service Mem., at 7).

Judge Abrams granted Plaintiff's requests on October 24, 2012.  (Dkt. No. 58).  Plaintiff served Vargas with the second amended complaint on November 16, 2012, making his answer due on December 7, 2012.  See Dkt. No. 61; Fed. R. Civ. Pro. Rule 12(a)(1)(A)(i).  Vargas did not file an answer.

On January 3, 2013, Plaintiff and Defendants Blue Fresh, LLC, Mendez MG Distributors, and Jose Alex Mieces (the "Consenting Defendants") consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, and Judge Abrams referred the case to me for all purposes.  (Dkt. No. 62).[6]  On February 11, 2013, following a telephone conference at which the parties reported a settlement, I issued an order directing the parties to submit an executed consent injunction that would resolve Plaintiff's claims as to all remaining defendants except for defendant Vargas, and further ordered that Plaintiff could move for a default judgment against Vargas.  (Dkt. No. 64).  On February 19, 2013, I approved the consent injunction executed by Plaintiff and the Consenting Defendants.  (Dkt. No. 66).  On March 14, 2013, Plaintiff filed a motion for default judgment against defendant Vargas and filed proof of service on April 12, 2013.  (Dkt. Nos. 68 & 75).  To date, Vargas has not appeared, answered, or otherwise responded to Plaintiff's second amended complaint or its motion for default judgment.

---

[6] The following defendants had previously entered into a consent order for an injunction on April 4, 2012: Bliss Beauty, Inc., Ugly & Beauty, Inc., Uglybeauty.com, Best Shop NY Inc., Jeff An, Sae Hyong An, Amor Beauty Supply Corp., Eleanor Beauty Supply Corp., NEO II Beauty Supply, Inc., Beauty Club, LLC, AE Beauty Supply Corp., Neo Mini Beauty Supply, Tremont Beauty Supply, and JYS Trading Corp.  (Dkt. No. 30).  On July 31, 2013, Plaintiff's counsel submitted a letter advising the Court that Plaintiff did not intend to seek default judgments against Exclusive Beauty Supply Inc., New Jasmin Beauty Supply Inc., Novel Beauty Supply Corp., and/or Virgin Beauty Supply Corp.; accordingly, I dismissed those defendants pursuant to Rule 41 of the Federal Rules of Civil Procedure.  (Dkt. No. 77).

## II.   DISCUSSION

### A.   Applicable Standards

#### 1.   Default Judgment Standards

A default judgment may be awarded in accordance with Rule 55 of the Federal Rules of Civil Procedure "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend" against an action.  Fed. R. Civ. P. 55(a).  "Rule 55 sets forth a two-step process for an entry of default judgment."  GuideOne Specialty Mutual Ins. Co. v. Rock Community Church, Inc., 696 F. Supp. 2d 203, 208 (E.D.N.Y. 2010) (citing Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95-96 (2d Cir. 1993)).  First, the movant must file an affidavit demonstrating that the party against whom default judgment is sought has been properly served and has failed to defend, upon which the clerk of the court enters the party's default into the record.  See id.; Fed. R. Civ. P. 55(a); Local Rule 55.1.  "Second, after the clerk of the court enters default against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), the court may enter default judgment."  GuideOne Specialty Mut. Ins. Co., 696 F. Supp. 2d at 208 (citing Fed. R. Civ. P. 55(b)).

"Under the case law interpreting [Rule 55(b)], the default establishes [a defendant's] liability . . . as long as the complaint has stated a valid cause of action."  Kuruwa v. Meyers, 823 F. Supp. 2d 253, 256 (S.D.N.Y. 2011) (citing City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011) and Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995)), aff'd, 512 Fed. Appx. 45 (2d Cir. 2013).  "In light of [the defendant's] default, a court is required to accept all of the [plaintiff's] factual allegations as true and draw all reasonable inferences in its favor."  Finkel, 577 F.3d at 84.  "[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability."  Rolex Watch U.S.A., Inc. v.

7

Rolex Deli Corp., No. 11 Civ. 9321 (BSJ), 2012 WL 5177517, at *1 (S.D.N.Y. Oct. 18, 2012) (citing Greyhound Exhibitgroup, 973 F.2d at 158 and Getty Images (US) Inc. v. Advernet, Inc., 797 F. Supp. 2d 399, 411 (S.D.N.Y. 2011)).

"However, the 'district court has discretion under Rule 55(b)(2) once a default is determined to require proof of necessary facts and need not agree that the alleged facts constitute a valid cause of action.'" Curves Int'l, Inc. v. Negron, No. 11 Civ. 2986 (ADS) (GRB), 2012 WL 4490542, at *3 (E.D.N.Y. Aug. 31, 2012) (citing Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)), Report & Recommendation, adopted by 2012 WL 4490553, (E.D.N.Y. Sept. 28, 2012). "In other words, even after a default, 'it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law.'" Johnson & Johnson v. Azam Int'l Trading, No. 07 Civ. 4302 (SLT) (SMG), 2013 WL 4048295, at *8 (E.D.N.Y. Aug. 9, 2013) (quoting Labarbera v. ASTC Labs., Inc., 752 F. Supp. 2d 263, 270 (E.D.N.Y. 2010)). Therefore, a default "only establishes a defendant's liability if those allegations are sufficient to state a cause of action against the defendant." Taizhou Zhongneng Imp. & Exp. Co. v. Koutsobinas, 509 Fed. Appx. 54, 56 (2d Cir. 2013).

Moreover, the complaint must still comply with the pleading standards of the Federal Rules of Civil Procedure, which require more than a "formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted). The pleadings must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citations omitted). Despite a defendant's default, "a complaint containing only '[t]hreadbare recitals of the elements of a cause of action, supported

8

by mere conclusory statements, do[es] not suffice.'" <u>Johnson & Johnson</u>, 2013 WL 4048295, at
*8 (quoting <u>Iqbal</u>, 556 U.S. at 678).  Moreover, "Rule 8(a) is violated where a plaintiff, by
engaging in group pleading, fails to give each defendant fair notice of the claims against it."
<u>Automated Transaction LLC v. New York Cmty. Bank</u>, No. 12 Civ. 3070 (JS) (ARL), 2013 WL
992423, at *4 (E.D.N.Y. Mar. 13, 2013) (internal quotations omitted); <u>see also</u> <u>Am. Sales Co. v.
Astrazeneca AB</u>, No. 10 Civ. 6062 (PKC), 2011 WL 1465786, at *5 (S.D.N.Y. Apr. 14, 2011)
(Under Rule 8(a)(2), "[a] complaint should offer 'specification' as to the 'particular activities by
any particular defendant. . . .'" (citing <u>In re Elevator Antitrust Litig.</u>, 502 F.3d 47, 50 (2d Cir.
2007))).

     2.   <u>Standard Governing Damages</u>

"It is well-settled in this Circuit that even after a default judgment is entered against
defendants, 'the allegations in the complaint with respect to the amount of the damages are not
deemed true." <u>Gutman v. Klein</u>, No. 03 Civ. 1570 (BMC) (RML), 2010 WL 4916722, at *6
(E.D.N.Y. Nov. 24, 2010) (quoting <u>Credit Lyonnais Sec. (USA), Inc. v. Alcantara</u>, 183 F.3d 151,
155 (2d Cir. 1999)).  Instead, a plaintiff "bears the burden of establishing [its] entitlement to
recovery and thus must substantiate [its] claim with evidence to prove the extent of damages."
<u>Dunn v. Advanced Credit Recovery Inc.</u>, No. 11 Civ. 4023 (PAE) (JLC), 2012 WL 676350, at *2
(S.D.N.Y. Mar. 1, 2012) (citing <u>Greyhound Exhibitgroup</u>, 973 F.2d at 158), Report &
Recommendation, <u>adopted by</u> 2012 WL 1114335 (S.D.N.Y. Apr. 3, 2012).  To establish
damages upon a default, the movant must "prove that the 'compensation sought relate[s] to the
damages that naturally flow from the injuries pleaded.'" <u>Curves Int'l</u>, 2012 WL 4490542, at *3
(citing <u>Greyhound Exhibitgroup</u>, 973 F.2d at 159).  "In determining damages not susceptible to
simple mathematical calculation, Federal Rule of Civil Procedure 55(b)(2) gives courts

9

discretion to determine whether an evidentiary hearing is necessary or whether to rely on detailed affidavits or documentary evidence." Dorn v. Berson, No. 09 Civ. 2717 (ADS) (AKT), 2012 WL 1004907, at *3 (E.D.N.Y. Mar. 1, 2012) (citing Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991)), Report & Recommendation, adopted by 2012 WL 1004905 (E.D.N.Y. Mar. 23, 2012). "Even in the absence of a hearing, however, the district court cannot simply rely on the Plaintiff's statement of damages; there must be a basis upon which the court may establish damages with reasonable certainty." House v. Kent Worldwide Mach. Works, Inc., 359 F. App'x 206, 207 (2d Cir. 2010) (citing Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997)). "Magistrate judges and district courts have interpreted this to mean that, even when the defendant defaults and is not present to object, damages must be based on admissible evidence." Id. (citations omitted). Here, a hearing is unnecessary, as the documents before the Court provide a "sufficient basis from which to evaluate the fairness" of the damages requested. Fustok v. ContiCommodity Servs. Inc., 873 F.2d 38, 40 (2d Cir. 1989).

**B.    Liability**

1.    Parties and Jurisdiction

Plaintiff Laboratorios Rivas, SRL is a corporation organized under the laws of the Dominican Republic, with its principal place of business at Prolongacion Presidente Vasquez, Ensanche Alma Rosa II, Santo Domingo, Dominican Republic. (SAC ¶ 3). Vargas maintains a residence and/or place of business at 9560 Queens Boulevard, Rego Park, New York 11374. (SAC ¶ 9). He also maintains a residence in West Palm Beach, Florida. (Id.). He had a business relationship with the Consenting Defendants and was alleged to have been "engaged in the

10

manufacture, packaging[,] marketing, promotion and distribution of the counterfeit product."
(SAC ¶¶ 12-13).

Plaintiff brought this action under the Trademark Counterfeiting Act of 1984, 15 U.S.C.
§§ 1116-17, Sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114 and 1125, New York
General Business Law § 368-d, and New York common law.  The Court has subject matter
jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1332, 1338(a), 1367, and 15
U.S.C. § 1121(a).  The Court also has personal jurisdiction over Vargas given that he resides,
transacts, or does business in New York and the counterfeit product at issue in this case is being
distributed in New York.  (SAC ¶ 17).  See e.g., Gucci Am., Inc. v. MyReplicaHandbag.com,
No. 07 Civ. 2438 (JGK), 2008 WL 512789, at *2 (S.D.N.Y. Feb. 26, 2008) (shipment of goods
to New York supported finding of jurisdiction in trademark action) (citing Baron Philippe de
Rothschild, S.A. v. Paramount Distillers, Inc., 923 F. Supp. 433, 436-37 (S.D.N.Y. 1996)).

    2.    Facts Establishing Vargas's Liability

While the second amended complaint describes the counterfeit scheme involving
Plaintiff's products and states a claim for trademark infringement against various defendants,
Plaintiff neither articulates the specific role in the scheme played by Vargas nor details any of
Vargas's individual conduct that would support a claim of trademark infringement against him.
Rather, in setting forth the allegations against him, Plaintiff refers to Vargas and the Consenting
Defendants collectively as the "Distributors."  (SAC ¶ 49).  Vargas is only explicitly mentioned
by name in three paragraphs, wherein Plaintiff provides Vargas's name and address, states that
he has a business relationship with the Consenting Defendants, and conclusorily alleges that he,
along with the other Distributors, is "responsible for the manufacture, packaging, marketing,
promotion and distribution of counterfeit Silicon Mix product."  (See SAC ¶¶ 9, 12, 49).

11

Plaintiff does not explain how Vargas is responsible for the alleged counterfeit activity, but instead broadly asserts that all of the Distributors are: "believed to have manufactured or caused to be manufactured counterfeit product in essentially the same color and consistency as that of the genuine product; packaged or caused to be packaged counterfeit product in containers that are identical or nearly identical to that of the Plaintiff; and created or caused to be created labeling for said containers that are identical or nearly identical reproductions of labels used by Plaintiff in connection with the genuine product." (SAC ¶ 50). Additionally, Plaintiff states that the Distributors "are believed to have marketed and sold the counterfeit product, representing it to be genuine Silicon Mix, to one or more of the other defendants and retail sales outlets and internet providers named hereinabove, between the period June 2010 to date in New York and New Jersey." (SAC ¶ 51)

Standing alone then, the second amended complaint lacks allegations sufficient to establish Vargas's particular role in the counterfeit scheme. However, Plaintiff provides more information in the documentary evidence attached to its motion for default judgment, which specifically describes Vargas's involvement in the sale and/or distribution of counterfeit products to two different retail outlets. For purposes of this motion, the Court may rely on the facts taken from these materials as well. See, e.g., Arroyo v. Frontline Asset Strategies, LLC, No. 13 Civ. 195 (BMC), 2013 WL 1623606, at *1 (E.D.N.Y. Apr. 15, 2013) (considering facts taken from "plaintiff's motion for a default judgment to the extent they are supported by evidence that plaintiff has submitted"); Pita v. Tulcingo Car Serv., No. 10 Civ. 0481 (DLI) (JO), 2011 WL 1790833, at *1 (E.D.N.Y. Apr. 7, 2011) (drawing facts from "the uncontroverted documents submitted in support of the instant motion for default judgment"), Report & Recommendation, adopted by 2011 WL 1827125 (E.D.N.Y. May 10, 2011).

12

In the affidavit of William B. Belmont in support of Plaintiff's Motion for Default Judgment ("Belmont Aff.") (Dkt. No. 73), Belmont states that in or about July of 2011, the Belmont Group was hired by Plaintiff's counsel to investigate the source and scope of the scheme to counterfeit Plaintiff's products. (Belmont Aff. at ¶ 4). Investigators from the Belmont Group visited various retail stores that were selling counterfeit Silicon Mix products. (Belmont Aff. at ¶ 5). Two of the retailers, Amor Beauty Supply ("Amor Beauty") and Bliss Beauty Inc. ("Bliss Beauty"), provided the Belmont Group with invoices given to them by the person who sold them the counterfeit product, an individual named "John." (Belmont Aff. at ¶ 6). Both invoices, which were from a confectionary company called E.A. Berg, located in Maywood, New Jersey, featured the same handwriting, were consecutively numbered, and were dated September 1, 2010. (Id.). The Belmont Group contacted E.A. Berg and, during the course of several phone conversations on January 12 and 13, 2012, David Berg, a principal of E.A. Berg, confirmed that: E.A. Berg had a sales person named Juan U. Vargas whose territory included both the Amor Beauty and Bliss Beauty stores; and that Vargas was employed by E.A. Berg as a salesperson from May 16, 2009 until June 24, 2010, when, prior to being terminated, he quit because he claimed he was relocating to Florida. (Id.).[7]

---

[7] Counsel for Plaintiff, Karen Wilshinsky, Esq., cites the Belmont Affidavit in support of the statement that Vargas was "identified as a distributor and the possible manufacturer of counterfeit products." Karen Wilshinsky's Affidavit in Support of Motion for Default Judgment ("Wilshinsky Aff."), ¶ 16 (Dkt. No. 69). She further states, without any evidentiary support, that "Mr. Vargas had a preexisting business relationship with Defendants Jose "Alex" Mieces, Blue Fresh LLC, and Mendez Distributors wherein Mr. Mieces and Blue Fresh, LLC acquired the La Fresca brand name, trademark, and feminine hygiene products from Mr. Vargas." (Id.). To start, the Belmont Affidavit in no way suggests that Vargas was a "possible manufacturer of counterfeit products." Rather, it establishes only that Vargas had been a salesperson at E.A. Berg whose territory included the retailers Amor Beauty and Bliss Beauty, and that someone identified as "John" had provided Amor Beauty and Bliss Beauty with E.A. Berg invoices when he sold them counterfeit products. Belmont Aff., ¶ 6. Second, it is not clear to the Court how

13

Vargas was served with the second amended complaint via certified mail on November 16, 2012 and a return receipt was stamped November 20, 2012, confirming service. See Affidavit of Service (Dkt. No. 61). Having received no response from Vargas, Plaintiff sought a certificate of default pursuant to Rule 55(a), which the Clerk entered on February 11, 2013 (Dkt. No. 65), and then Plaintiff filed a motion for default judgment on March 14, 2013 (Dkt. No. 68).

3.    Vargas Is Liable for Trademark Infringement

In its motion for default judgment, Plaintiff requests damages relating to its claims against Vargas for willful trademark infringement. (Pl. Mem. at 1).[8] To establish a valid claim for trademark infringement under the Lanham Act, "a plaintiff must demonstrate: '(1) that it has a valid mark that is entitled to protection under the Act and (2) that [the defendant's] actions are likely to cause confusion as to the origin of the mark.'" L'Oreal USA, Inc. v. Trend Beauty Corp., No. 11 Civ. 4187 (RA), 2013 WL 4400532, at *14 (S.D.N.Y. Aug. 15, 2013) (quoting Gucci Am., Inc. v. Duty Free Apparel, Ltd., 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003)); see, e.g., Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 102 (2d Cir. 2010) (internal quotation omitted); K Ya Int'l, Inc., 2010 WL 2771897, at *2 (citation omitted).

---

the fact that Mieces and Blue Fresh acquired a completely separate trademark, La Fresca, from Vargas supports Plaintiff's allegation that Vargas is responsible for the "manufacture, packaging, marketing, promotion, and distribution of counterfeit product bearing the Plaintiff's Trademarks." Wilshinsky Aff., ¶ 16.

[8] Plaintiff does not seek relief for the other causes of action asserted in the second amended complaint. (Pl. Mem. at 1). Therefore, in evaluating whether Plaintiff has established a valid cause of action, the Court only considers Vargas's liability as to the claim of trademark infringement. See Coach Servs., Inc. v. K Ya Int'l, Inc., No. 09 Civ. 4656 (RMB) (JCF), 2010 WL 2771897, at *2 (S.D.N.Y. June 10, 2010) ("In connection with this inquest, the plaintiff has requested damages only for trademark infringements in violation of the Lanham Act, and therefore liability need only be considered with respect to that claim."), Report & Recommendation, adopted by 2010 WL 2771907 (S.D.N.Y. July 12, 2010).

As noted above, Plaintiff's allegations in the second amended complaint that the Distributors manufactured, packaged, marketed, promoted, and/or distributed a counterfeit product are not sufficiently particularized as to Vargas. (SAC ¶¶ 49-50). See Astrazeneca AB, 2011 WL 1465786, at *5. However, considering the facts set forth in the documentary evidence supporting Plaintiff's motion, in conjunction with those in the second amended complaint, the Court is satisfied that there is sufficient evidence to support the conclusion that Vargas played at least some role in the counterfeiting scheme and that Plaintiff's allegations establish the requisite elements of trademark infringement.[9] First, it is clear that Plaintiff owns the United States, Dominican Republic, and Puerto Rican trademarks for Silicon Mix and the United States, Dominican Republic, Puerto Rican, and Panamanian Avanti trademarks, which are valid, subsisting, and in full force and effect. (SAC ¶¶ 22-24; SAC Exs. B and C). Notwithstanding Plaintiff's ownership and the validity of these trademarks, Vargas, without authorization from Plaintiff, distributed a counterfeit product that was essentially the same color and consistency as Plaintiff's and was packaged in a container that bore labels and insignia that were virtually identical to Plaintiff's trademarked product. (SAC ¶¶ 49-50, 56-57; SAC Ex. D; Affidavit of Sigmundo Rivas ("S. Rivas Aff."), ¶¶ 11, 22-23 (Dkt. No. 70); Belmont Aff. ¶ 6). Second, Plaintiff packages its products in "distinctive white containers" with labels featuring the Avanti trademark and the "stylized presentation of the Silicon Mix trademark." (SAC ¶¶ 25). The products and distinctive trade dress have come to be recognized by consumers, "in particular in the Dominican and other ethnic markets in the ethnic hair care market," as ones of high quality.

---

[9] This finding is further reinforced by the fact that, despite apparently being aware of the claims against him and having asked Plaintiff's local distributor to persuade Plaintiff to withdraw the suit (see supra, at 5 n.5), Vargas has failed to appear and has made no efforts whatsoever to defend himself in this case. See Pl. Service Mem., at 7.

(SAC ¶ 28).  Given the nearly identical packaging, labeling, and trade dress (SAC ¶ 57), and that

"counterfeits, by their very nature, cause confusion," there is likely to be confusion between

Plaintiff's authentic merchandise and counterfeit products.  Gucci Am., Inc. v. Tyrrell-Miller,

678 F. Supp. 2d 117, 120 (S.D.N.Y. 2008) (internal quotation omitted).  Accordingly, such use

of the trademarks constitutes trademark infringement.

I further find Vargas's trademark infringement to be willful.  As an initial matter, his

infringement and role in the counterfeiting scheme is deemed willful "[b]y virtue of the

default[.]" Tiffany (NJ) Inc. v. Luban, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003); see, e.g.,

Lucerne Textiles, Inc. v. H.C.T. Textiles Co., 12 Civ. 5456 (KMW) (AJP), 2013 WL 174226, at

*3 (S.D.N.Y. Jan. 17, 2013) (Defendant is "deemed to be a willful infringer by virtue of its

default."), Report & Recommendation, adopted by 2013 WL 1234911 (S.D.N.Y. Mar. 26, 2013);

Chloe v. Zarafshan, No. 06 Civ. 3140 (RJH) (MHD), 2009 WL 2956827, at *7 (S.D.N.Y. Sept.

15, 2009) ("Willfulness may be established by a party's default because an innocent party would

presumably have made an effort to defend itself.").  Moreover, Vargas's willfulness is suggested

by the similarity in appearance between the counterfeit and genuine Silicon Mix merchandise

that Plaintiff has presented to the Court.  (SAC ¶¶ 50, 56-57; SAC Ex. D; S. Rivas Aff. ¶¶ 11,

22-23).  See Coach, Inc. v. Melendez, No. 10 Civ. 6178 (BSJ) (HBP), 2011 WL 4542971, at *5

(S.D.N.Y. Sept. 2, 2011) (citing cases) (Because the marks on the counterfeit products "are

virtually identical to the [plaintiff's registered trademarks], the conclusion is inescapable that

defendants' infringement and counterfeiting is intentional."), Report & Recommendation,

adopted by 2011 WL 4542717 (S.D.N.Y. Sept. 30, 2011).

C.    **Inquest**

1.    Damages

Having found that Vargas is liable for trademark infringement, the Court must "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." Credit Lyonnais Secs. (USA) v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999); see also Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997). This inquiry "involves two tasks: determining the proper rule for calculating damages on such a claim, and assessing plaintiff's evidence supporting the damages to be determined under this rule." Credit Lyonnais, 183 F.3d at 155. Relevant to this first task is the fact that Plaintiff has elected to recover statutory damages under 15 U.S.C. § 1117(c), rather than damages tied to its actual losses or to Vargas's profits. (Pl. Mem. at 1). Accordingly, the Court must assess Plaintiff's entitlement to statutory damages under 15 U.S.C. § 1117(c).

Pursuant to the Lanham Act, a trademark owner may elect to recover an award of statutory damages instead of actual damages for an amount between $1,000 and $200,000 "per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just;" or, if the court finds the use of the mark to have been willful, up to $2,000,000 per counterfeit mark per type of good. 15 U.S.C. § 1117(c); see generally All-Star Marketing Group, LLC v. Media Brands Co., Ltd., 775 F. Supp. 2d 613, 620-21 (S.D.N.Y. 2011) ("The rationale for § 1117(c) is the practical inability to determine profits or sales made by counterfeiters.") (citations omitted). This provision of the Lanham Act "does not provide guidelines for courts to use in determining an appropriate award, as it is only limited by what 'the court considers just.'" Duty Free Apparel, 315 F. Supp. 2d at 520 (internal citation omitted). Despite the lack of guidelines, "courts have found some guidance in the caselaw of an analogous

provision of the Copyright Act, 17 U.S.C. § 504(c), which also provides statutory damages for willful infringement." Id. (citations omitted).  Under the statutory-damages framework articulated by the Second Circuit in Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., 807 F.2d 1110, 1117 (2d Cir. 1986) ("Fitzgerald"), courts consider:  (1) "the expenses saved and the profits reaped;" (2) "the revenues lost by the Plaintiff;" (3) "the value of the copyright" or, by analogy, trademark; (4) "the deterrent effect on others besides the defendant;" (5) "whether the defendant's conduct was innocent or willful;" (6) "whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced;" and (7) "the potential for discouraging the defendant." Duty Free Apparel, 315 F. Supp. 2d at 520 (citing Fitzgerald, 807 F.2d at 1117); see, e.g., All-Star Marketing Group, 775 F. Supp. 2d at 622-23 (applying test for statutory damages in trademark action subsequent to defendants' default); Luban, 282 F. Supp. 2d at 125 (same); Melendez, 2011 WL 4542971, at *6-7 (same). Statutory damages are designed not only to compensate injuries sustained but also to discourage wrongful conduct.  See Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 113-14 (2d Cir. 2001); Tiffany (NJ) LLC v. Dong, No. 11 Civ. 2183 (GBD) (FM), 2013 WL 4046380, at *5 (S.D.N.Y. Aug. 9, 2013).

 Here, the Fitzgerald factors counsel in favor of awarding monetary damages to Plaintiff. Although it is impossible to know Vargas's profits, Plaintiff has nonetheless established that its registered trademarks—recognized as symbols of high quality—annually generate more than a million dollars per year.  (SAC ¶ 27).  Further, while nothing in the record demonstrates how much revenue was lost as a result of Vargas's infringement, an award of statutory damages will serve as a "specific deterrent" to Vargas, "and as a general deterrent to others who might consider engaging in infringing conduct in the future."  See, e.g., Kenneth Jay Lane, Inc. v.

Heavenly Apparel, Inc., No. 03 Civ. 2132 (GBD) (KNF), 2006 WL 728407, at *6 (S.D.N.Y. Mar. 21, 2006).  In addition, this Court has already found that Vargas's conduct was willful given the similarity between the genuine and counterfeit products and "[b]y virtue of [Vargas's] default."  Luban, 282 F. Supp. 2d at 124.  Finally, Vargas has not cooperated in providing any records from which to assess the value of the infringing material.  Sara Lee Corp. v. Bags of N.Y., Inc., 36 F. Supp. 2d 161, 165 (S.D.N.Y. 1999) ("Statutory damages are most appropriate when infringer nondisclosure during fact finding leaves damages uncertain.").  Thus, while the first and second factors remain neutral, the remaining factors weigh in favor of an award of statutory damages.

"[S]tatutory damages are a substitute for actual damages, and should replicate as nearly as possible the actual harm done to the successful plaintiff without punishing it for lacking information on the issue due to the absent defendant's default."  Mamiya Am. Corp. v. HuaYi Bros., No. 09 Civ. 5501 (ENV) (JO), 2011 WL 1322383, at *7 (E.D.N.Y. Mar. 11, 2011) (citations omitted), Report & Recommendation, adopted by 2011 WL 1253748 (E.D.N.Y. Mar. 31, 2011).  However, because Vargas's illegal profits cannot be precisely determined, "the court may resolve any doubts against [him] in calculating profits, particularly if the uncertainty is due to [his] . . . failure to produce documentary evidence."  Harris v. Fairweather, No. 11 Civ. 2152 (PKC) (AJP), 2012 WL 3956801, at *3 (S.D.N.Y. Sept. 10, 2012) (quoting Chloe, 2009 WL 2956827, at *5), Report & Recommendation, adopted by 2012 WL 5199250 (S.D.N.Y. Oct. 19, 2012).  The fact that Plaintiff has provided little evidence as to the extent of Vargas's infringement and the amount of counterfeit product actually sold does not proscribe an award of statutory damages as "'there is no necessary mathematical relationship between the size of such an award and the extent or profitability of [Vargas's] wrongful activities.'"  Ellington v. Harbrew

Imports Ltd., 812 F. Supp. 2d 186, 195 (E.D.N.Y. 2011) (quoting Gucci Am., Inc., v. Gold Ctr.

Jewelry, 997 F. Supp. 399, 404 (S.D.N.Y. 1998)) (granting statutory damages despite "little

evidence in the complaint of how extensive or widespread the infringement actually was"); see

also Mamiya, 2011 WL 1322383, at *7 (recommending award for default where plaintiff only

provided "limited evidence of actual harm it has suffered, noting only the potential for lost sales"

and failed "to explain why an award of greater than the statutory minimum is necessary for

deterrence").

 Nonetheless, to establish damages upon a default, the movant must "prove that the

'compensation sought relate[s] to the damages that naturally flow from the injuries pleaded.'"

Curves Int'l, 2012 WL 4490542, at *3 (quoting Greyhound Exhibitgroup, 973 F.2d at 159). In

its memorandum in support of the motion for default judgment, Plaintiff asserts that counterfeit

products were "found in a minimum of eighteen distinct sales outlets, as well as an internet

supplier," and argues it is entitled to statutory damages of $360,000. Pl. Mem. at 4-5.[10] In

explaining how it arrived at this figure, Plaintiff states that:

 [I]t is a conservative estimate to state that the distribution of counterfeit product to
 these [eighteen] sales outlets resulted in at least a $10,000 gain of illegal profits

---

[10] As noted above, it is not clear to the Court that counterfeit goods were in fact found in at least
18 locations because Plaintiff fails to include a complete list of retailers and refers to different
retailers inconsistently. The original complaint names 18 different "Sales Outlets" but it lists
Novel Beauty Supply ("Novel") and Virgin Beauty Supply ("Virgin") as two separate entities,
while also providing the same address for both of them and stating that that Virgin is also known
as Novel. Compl. ¶¶ 16, 19. Other documents are similarly ambiguous in specifying whether
the two entities are actually one. (SAC ¶¶ 6, 7, 30, 35; S. Rivas Aff, ¶ 11; Affidavit of Franco
Rivas, Ex. A). Moreover, the retailers Neo Mini Beauty Supply and Neo II Beauty Supply are
often referred to interchangeably and with different addresses (as well as being associated with
other names – Mimi Discount Beauty Supply and Premium Beauty Corp.), making it difficult to
determine what entity is being described. (Compl. ¶¶ 13, 14; SAC ¶ 35; Kessler Aff., ¶ 5,
Belmont Aff. ¶ 5; Affidavit of Franco Rivas, Ex. A). In any event, because the allegations
against Vargas only relate to two retailers, the number of stores where counterfeit products were
found is immaterial for purposes of the pending motion.

for [Vargas] at each individual sales outlet.  Multiplying this 10,000 figure by just the eighteen individual sales outlets the Plaintiff has knowledge of results in an amount of $180,000.  Moreover, the number must be doubled because Defendant infringed two separate registered marks: 'SILICON MIX' and 'AVANTI.'  Since Section 1117(c) provides damages 'per mark,' Plaintiff should therefore be awarded $360,000.00 in statutory damages." Pl. Mem. at 4-5.

While Plaintiff requests $10,000 for 18 separate sales outlets, Plaintiff's submissions are only sufficient to connect Vargas to two individual stores: Amor Beauty and Bliss Beauty. (Belmont Aff., ¶ 6).  Plaintiff does not provide any justification for a damages figure that is based on hypothesized profits from all 18 retailers where counterfeit products were discovered. Moreover, while Vargas's "counterfeiting actions" may have "resulted in damage to Plaintiff's reputation and goodwill," Plaintiff offers no evidence warranting further compensation beyond statutory damages for these generalized harms. (Pl. Mem., 5).

Despite the lack of evidence to support an award for 18 separate outlets, the Court concludes that $10,000 is a reasonable starting point as far as a damages calculation is concerned.  Generally, the Lanham Act statutory minimum of $1,000 is presumptively sufficient for purposes of deterrence and compensation, except in cases of willfulness, for which the statute provides for as much as a ten-fold increase in the maximum award.  See, e.g., Mamiya, 2011 WL 1322383, at *8 (citing 15 U.S.C. 1117(c)(2)).  The Lanham Act further provides recovery for damages for each mark infringed. Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 105-06 (2d Cir. 2012) ("A plaintiff may elect . . . to recover statutory damages for the use of a counterfeit mark that are computed 'per counterfeit mark per type of goods or services sold, offered for sale, or distributed.'") (quoting 15 U.S.C. § 1117(c)); Mamiya, 2011 WL 1322383, at *8 ("A further basis for increasing the award over the statutory minimum is the fact that the violation here involved two separate marks.").

21

Thus, accounting for Vargas's willfulness, which renders the ten-fold increase of $1,000

to $10,000 per mark reasonable, and that the violation involved two marks, an award of $20,000

is appropriate.  Furthermore, the Court "considers [it] just" to double that figure given Plaintiff's

evidence that Vargas distributed goods to two specific retail outlets.  Accordingly, the Court

recommends granting Plaintiff statutory damages of $40,000.

### 2. Injunctive Relief

In addition to statutory damages, Plaintiff also seeks a permanent injunction enjoining

Vargas from infringing its trademarks.  (Pl.'s Mem. at 6).  In the Second Circuit, where a party

seeks injunctive relief in an action alleging trademark infringement, courts apply the four-factor

test enunciated by the Supreme Court in eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 390

(2006).[11]  Under that standard, injunctive relief should issue where a plaintiff has established a

likelihood of success on the merits in seeking a preliminary injunction, or has actually succeeded

on the merits in seeking a permanent injunction, and that:  (1) plaintiff is likely to suffer

irreparable injury in the absence of an injunction; (2) remedies at law, such as monetary

damages, are inadequate to compensate plaintiff for that injury; (3) the balance of hardships tips

---

[11] In Salinger v. Colting, 607 F.3d 68, 78 n.7 (2d Cir. 2010), the Second Circuit extended the test articulated by eBay, a patent action involving a permanent injunction, "to preliminary injunctions in the context of copyright cases[.]"  Although the Second Circuit did not explicitly extend the eBay test to trademark actions, the Court stated that it saw "no reason that eBay would not apply with equal force to an injunction in any type of case."  Id. (emphasis in original) ("eBay strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context.").  In light of Salinger, district courts in this Circuit have extended eBay to trademark actions as well.  See, e.g., U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 539 (S.D.N.Y. 2011) (applying Salinger's extension of eBay in a trademark action) (citing Pretty Girl, Inc. v. Pretty Girl Fashions, Inc., 778 F. Supp. 2d 261, 265 (E.D.N.Y. 2011) and NYC Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 328 (S.D.N.Y. 2010)).

in plaintiff's favor; and (4) the public interest would not be disserved by the issuance of a preliminary injunction.  See Salinger, 607 F.3d at 80 (citing eBay, 547 U.S. at 391).

The first eBay factor, irreparable harm, is "automatically satisfied by actual success on the merits, as irreparable harm is established by 'a showing of likelihood of confusion.'" Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 142 (2d Cir. 1997) ("[T]he requirement of irreparable harm carries no independent weight, as we have held that a showing of likelihood of confusion (a requirement of both trademark infringement and unfair competition claims) establishes irreparable harm.").  As noted above, Vargas's default constitutes an admission of liability as to the trademark infringement claim such that Plaintiff has established a likelihood of confusion from which irreparable harm is presumed.

The second eBay factor, no adequate remedy at law, "is satisfied 'where the record contains no assurance against defendant's continued violation' of Plaintiff's trademark." Sexy Hair Concepts, LLC v. Sexy Hair Inc., No. 12 Civ. 3937 (ARR) (MDG), 2013 WL 5460629, at *4 (E.D.N.Y. Sept. 30, 2013) (quoting Montblanc-Simplo GmbH v. Colibri Corp., 692 F. Supp. 2d 245, 259 (E.D.N.Y. 2010)) (granting permanent injunction against defaulting defendant after applying eBay test to claim of trademark infringement).  Where default is entered, "[a] court may infer from a defendant's default that it is willing to, or may continue its infringement." Pearson Educ., Inc. v. Vergara, No. 09 Civ. 6832 (JGK) (KNF), 2010 WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010) (citations omitted), adopted by Order at Dkt. No. 21 (S.D.N.Y. May 11, 2011). Vargas's default thus weighs against him on this factor.

Finally, the third and fourth eBay factors, those requiring a balance of hardships and a consideration of the public interest, favor Plaintiff.  "The balance of hardships weighs in [Plaintiff's] favor since [Vargas] has not identified any hardships for the Court to consider."

23

Hounddog Prods., LLC v. Empire Film Grp., Inc., 826 F. Supp. 2d 619, 633 (S.D.N.Y. 2011);

see also Pearson Educ., Inc., 2010 WL 3744033, at *5 (same).  Likewise, "the public has an

interest in not being deceived—in being assured that the mark it associates with a product is not

attached to goods of unknown origin and quality."  NYC Triathlon, LLC, 704 F. Supp. 2d at 344

(granting motion to enjoin defendant from any further violations of trademark).  Here, the public

has an interest in being able to rely on the quality of the products bearing the Plaintiff's

registered trademarks and accordingly, the fourth factor, like the others, favors injunctive relief.

Therefore, I recommend that the Court enter the permanent injunction sought by Plaintiff,

and enjoin Vargas, his agents, and any persons in active concert or participation with him, from:

(a)   Using products bearing Plaintiff's Silicon Mix and Avanti trademarks
("Trademarks"), Registration Numbers 3459453 and 3695992, registered on
the Principal Register on July 1, 2008 and October 13, 2009, respectively;

(b)   Possessing, receiving, manufacturing, assembling, distributing, warehousing,
shipping, transshipping, transferring, storing, advertising, promoting,
offering, selling, or holding for sale, disposing, or in any other manner
handling or dealing with any goods, packaging, wrappers, containers and
receptacles, and any catalogues, price lists, promotional materials and the like
bearing a copy of colorable imitation of the Trademarks and/or trade dress;

(c)   Infringing the Trademarks and/or the trade dress;

(d)   Otherwise unfairly competing with Plaintiff;

(e)   Using any reproduction, counterfeit, copy or colorable imitation of the
Trademarks and/or trade dress in connection with publicity, promotion,
sale or advertising of goods sold by Vargas;, including without limitation,
health and beauty products bearing a colorable imitation of the
Trademarks and/or trade dress;

(f)   Affixing, applying, annexing or using in connection with the same any
goods, false description or any representation, including words or other
symbols, falsely describing, falsely representing such goods as being those
of Plaintiff and from offering such goods in commerce;

(g)   Using any trademark, trade name or trade dress in connection with the
manufacture, sale or distribution of any goods which may be calculated to

24

falsely represent such goods as being connected with, approved by or sponsored by Plaintiff;

(h)   Destroying, altering, disposing of, moving, removing, concealing, tampering with or in any manner secreting any and all business records, invoices, correspondence, books of account, receipts or any other documents or things relating or referring in any manner to the manufacture, advertising, receiving acquisition, importation, purchase, sale or offer for sale, distribution, warehousing or transfer of any merchandise bearing Plaintiff's Trademarks and/or trade dress;

(i)   Taking any action that may defeat, or may have the effect of defeating Plaintiff's ability to recover and recoup its damages and attorneys' fees from him, including, but not limited to, prohibiting Vargas from transferring any moneys from his current bank account to other accounts in order to secret assets, and prohibiting Vargas from disposing of any assets in order to reduce the ability to satisfy any eventual monetary award, until such time as any judgment against Vargas has been satisfied; and,

(j)   Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (i) above.

## 3.  Costs and Attorneys' Fees

Plaintiff also seeks reimbursement for attorneys' fees and costs in the amount of $63,264.79, which is comprised of $41,565.00 in attorneys' fees, $6,839.79 in litigation costs, and $14,860 in investigator fees.  (Pl. Mem., 9-10.)

### a.  Attorneys' Fees

Under the Lanham Act, a prevailing party may recover "reasonable attorney fees" in "exceptional cases."  15 U.S.C. § 1117(a).  The Second Circuit has held that deliberate and willful infringement is sufficient to deem a case "exceptional."  See, e.g., LY USA, Inc., 676 F.3d at 111 ("[T]he key [to an award of attorneys' fees] is willfulness on the part of the defendants."); Bambu Sales, 58 F.3d at 854 ("The finding of willfulness determines the right to attorneys' fees.").  Accordingly, where, as here, Vargas's infringement must be deemed willful

25

by virtue of his default, Plaintiff is entitled to attorneys' fees. U.S.A. Famous Original Ray's Licensing Corp. v. Famous Ray's Pizza Buffet, Inc., 12 Civ. 8753 (JGK) (GWG), 2013 WL 5363777, at *6 (S.D.N.Y. Sept. 26, 2013), Report & Recommendation, adopted by 2013 WL 5664058 (S.D.N.Y. Oct 17, 2013); Harris, 2012 WL 3956801, at *6.

District courts have broad discretion to determine a fee award. Hensley v. Eckerhart, 461 U.S. 424, 437 (1983); E*Trade Fin. Corp. v. Deutsche Bank AG, 374 F. App'x 119, 124 (2d Cir. 2010). In calculating the amount of attorneys' fees owed, the Court starts by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. See, e.g., Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 553 (2010); U.S.A. Famous Original Ray's, 2013 WL 5363777, at *7 (quoting Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182 (2d Cir. 2008)). Indeed, both the Second Circuit and the Supreme Court "have held that the lodestar--the product of a reasonable hourly rate and the reasonable number of hours required by the case--creates a 'presumptively reasonable fee.'" Millea v. Metro-North R.R., 658 F.3d 154, 166 (2d Cir. 2011) (quoting Arbor Hill, 522 F.3d at 183). "[T]he lodestar is not always conclusive," but "its presumptive reasonability means that" district courts should always "calculate it as a starting point" to determine attorneys' fees. Millea, 658 F.3d at 166. Then, if necessary, the Court may adjust the lodestar figure to reflect consideration of any case-specific circumstances.[12] See Dunn, 2012 WL 676350, at *5 n.8.

---

[12] The Supreme Court held in Perdue that the "the lodestar figure" is presumptively reasonable because it "includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee." 559 U.S. at 553. Those factors (known as the Johnson factors) include: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of

i.  Reasonable Hourly Rate

"The reasonable hourly rate is the rate a paying client would be willing to pay;" district courts must bear in mind that that "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." Arbor Hill, 522 F.3d at 190.  In assessing the reasonableness of the hourly rates, the Court may consider the prevailing market rates "for similar services by lawyers of reasonably comparable skill, experience and reputation." Gierlinger v. Gleason, 160 F.3d 858, 882 (2d Cir. 1998) (quoting Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984)); see, e.g., Reiter v. MTA New York City Transit Auth., 457 F.3d 224, 232 (2d Cir. 2006). "It is well-established that the prevailing community a district court should consider to determine the lodestar figure is normally 'the district in which the court sits.'" Reiter, 457 F.3d at 232 (citing Polk v. N.Y. State Dep't of Corr. Servs., 722 F.2d 23, 25 (2d Cir. 1983)). When seeking an attorneys' fees award, "the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum, 465 U.S. at 896 n.11.  The Court may also rely on its own familiarity with prevailing rates in its district to determine a reasonable rate.  See, e.g., Townsend v. Benjamin Enters., 679 F.3d 41, 59 (2d Cir. 2012); Miele v. New York State

---

the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." Id. at 551 n.4 (citing Hensley, 461 U.S. at 430 n. 3); see also, Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974)).  While Perdue advised that the lodestar presumption of reasonableness should only "be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee," (559 U.S. at 554), the Second Circuit has continued to apply both the lodestar approach and the Johnson factors to determine a presumptively reasonable fee.  See, e.g., Konits v. Karahalis, 409 F. App'x 418, 422 (2d Cir. 2011); Green v. City of New York, 403 F. App'x 626, 629 (2d Cir. 2010).

27

Teamsters Conference Pension & Ret. Fund, 831 F.2d 407, 409 (2d Cir. 1987).

Plaintiff seeks fees for the legal services rendered by McLaughlin & Wilshinsky, P.C. The billing rate in this case for Karen Wilshinsky and Kathryn McLaughlin, both partners at McLaughlin & Wilshinsky, P.C., was $300 per hour for each attorney. Wilshinsky Aff., ¶ 23, Ex. A at 1. For certain tasks, such as client meetings and court appearances that were attended by both partners, Ms. Wilshinsky and Ms. McLaughlin each charged a billing rate of $150 per hour. Wilshinsky Aff., ¶ 23. David Goldstein, an associate who also worked on this case, billed at a rate of $150 per hour. Wilshinsky Aff., ¶ 23, Ex. A at 1. Ms. Wilshinsky has been practicing in the Southern District for 20 years with a primary focus in trademark and unfair competition law; she has also practiced in the Eastern District of New York and before the United States Patent and Trademark Office. Wilshinsky Aff., ¶ 24. Plaintiff does not offer information regarding the background or experience of Ms. McLaughlin or Mr. Goldstein. However, the Court may take judicial notice of the dates of their admission to the New York Bar as provided in the records of the New York State Unified Court System, which are publicly available on its web site. See Dunn, 2012 WL 676350, at *6; Century 21 Real Estate, LLC v. Raritan Bay Realty, Ltd., No. 07 Civ. 1455 (CPS) (JO), 2008 WL 4190955, at *10 n. 6 (E.D.N.Y. Sept. 3, 2008). According to these records, Ms. McLaughlin was admitted to practice in 1993 and Mr. Goldstein was admitted in 2005. See Attorney Directory–Attorney Search, http://iapps.courts.state.ny.us/attorney/AttorneySearch (last visited on Oct. 3, 2013). Therefore, Ms. McLaughlin has apparently been licensed for at least 20 years and Mr. Goldstein for at least 8 years.

Though averring that their hourly charges are "commensurate with those generally charged for similar work in the Southern District of New York amongst attorneys of similar skill

28

and experience," Plaintiff's counsel do not provide any concrete information about such standard

hourly rates, as required by Blum.  See 465 U.S. at 896 n.11.  Nevertheless, the Court finds the

billing rates appropriate given that they are roughly equivalent to (or less than) fees charged by

attorneys in this District at small to midsize firms in other trademark infringement and

intellectual property cases.  See, e.g., Dweck v. Diana Amadi & Malibu Denim Co., 10 Civ.

2577 (RMB) (HBP), 2012 WL 3020029, at *4 (S.D.N.Y. July 6, 2012) (collecting cases

approving $180 to $440 hourly rates for intellectual property associates and finding $250 to be

reasonable rate for attorneys whose titles were unclear and in spite of "sketchy" background

information), Report & Recommendation, adopted by 2012 WL 3024185 (S.D.N.Y. Jul 24,

2012);  Grand Fia Inc. v. Hakakin, 11 Civ. 2578 (PGG) (KNF), 2012 WL 3578175, at *8-9

(S.D.N.Y. Aug. 13, 2012) (approving rates of $445 and $465 per hour for partner experienced in

trademark infringement and intellectual property law and $200 per hour for junior associate),

Report & Recommendation, adopted by, Order dated December 28, 2012 (11 Civ. 2578, Dkt.

No. 25); Harley v. Nesby, No. 08 Civ. 5791 (KBF) (HBP), 2012 WL 1537881, at *10 (S.D.N.Y.

May 2, 2012) (citing cases awarding associates rates between $180 and $440 in intellectual

property cases and approving rate of $265 for mid-level associate); Dunn, 2012 WL 676350, at

*6 (citing Margolies v. Cnty. of Putnam N.Y., No. 09 Civ. 2061 (RKE) (GAY), 2011 WL

721698, at *3 (S.D.N.Y. Feb. 23, 2011)) (noting that "courts have found attorneys' fees ranging

from $225 to $375 reasonable for civil litigators working in small firms" and finding proposed

rate of $300 per hour reasonable even where attorneys failed to provide information about extent

of experience or expertise).  Accordingly, the Court finds that the hourly rates of $150 for Mr.

Goldstein and $300 for Ms. Wilshinsky and Ms. McLaughlin are appropriate.

ii.   Reasonable Number of Hours

To enable a court to determine the reasonableness of the hours expended, a party seeking

an award of attorneys' fees "must document the application with contemporaneous time records

. . . specify[ing], for each attorney, the date, the hours expended, and the nature of the work

done." N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir.

1983); see, e.g., U.S.A. Famous Original Ray's, 2013 WL 5363777, at *7.  The critical inquiry is

"whether, at the time the work was performed, a reasonable attorney would have engaged in

similar time expenditures." Grant v. Martinez. 973 F.2d 96, 99 (2d Cir. 1992) (citation omitted).

If the Court finds that some of the claimed hours are "excessive, redundant or otherwise

unnecessary," it may reduce the number of reasonable hours accordingly.  Hensley, 461 U.S. at

434; Quaratino v. Tiffany & Co., 166 F.3d 422, 426 n.6 (2d Cir. 1999).  An attorney is not

entitled to fees arising from claims against other unrelated defendants.  See Lucerne Textiles,

2013 WL 174226, at *9 ("[The defaulting defendant] is not responsible for fees related to

[Plaintiff's] claims against other parties and, therefore, these entries warrant a reduction.");

Colon v. City of New York, Nos. 09 Civ. 0008 (JBW) (CLP) & 09 Civ. 0009 (JBW) (CLP),

2012 WL 691544, at *22 (E.D.N.Y. Feb. 9, 2012) (recommending denial of fees for tasks

unrelated to plaintiff's case against defaulting defendants), Report & Recommendation, adopted

by 2012 WL 686878 (E.D.N.Y. Mar. 2, 2012); Williamsburg Fair Hous. Comm. v. Ross–Rodney

Hous. Corp., 599 F. Supp. 509, 514 (S.D.N.Y. 1984) ("Where there are multiple defendants,

each defendant must bear the prevailing plaintiff's fees for time spent on matters clearly related

to the claims made against that defendant.") (citations omitted).

30

Plaintiff has furnished the Court with its attorneys' contemporaneous time records. (Wilshinsky Aff., Dkt. Nos. 69-10, 69-11).[13]  The records include the date(s), hours expended, and brief descriptions of the work done by Ms. Wilshinsky, Ms. McLaughlin, and Mr. Goldstein dating back to June 28, 2010.[14]  However, there are several issues with the billing records submitted by Plaintiff's counsel.  To start, the first mention of Vargas by name in the billing records is not until an entry labeled June 8 to June 21, 2011.  Dkt. No. 69-11, at 2.[15]  As Plaintiff cannot seek compensation for work relating solely to defendants other than Vargas, the attorney hours billed prior to June of 2011 should be excluded from the fee calculations.  See Entral Grp. Int'l, LLC v. Sun Sports Bar Inc., No. 05 Civ. 4836 (CBA), 2007 WL 2891419, at *11 (E.D.N.Y. Sept. 28, 2007) ("[P]laintiff's counsel seeks compensation . . . for work which pertained solely to [two other defendants] . . . , both of whom settled the claims against them.  Therefore, compensation for those hours should be disallowed.").  To the extent that any of the earlier time

---

[13] Plaintiff's memorandum of law in support of its motion for default and Wilshinsky's affidavit indicate that the attorney billing records are set forth in Exhibit I to the affidavit.  Pl. Mem. at 9; Wilshinsky Aff., ¶ 21.  However, the billing records are not labeled as "Exhibit I" and instead are split into two different documents with no page numbers.  They are listed on ECF as attachments to Wilshinsky's affidavit (Attachment Nos. 10 and 11 to Dkt. No. 69).  Thus, for purposes of clarity, this Report and Recommendation will refer to the relevant billing records by citing the affidavit (Dkt. No. 69) and the attachment number, as well as the ECF page number (for example, Dkt. No. 69-10 at 3).

[14] Plaintiff's submissions also include time billed by Camilla Barkovic, a law clerk, and Allison Wilkes and Maria Kuntz, whose positions are unidentified.  Dkt. No. 69-10 at 14; Dkt No. 69-11 at 5.  However, Plaintiff does not request reimbursement for the fees charged by these individuals.

[15] Though the original complaint was filed on August 25, 2011 (Dkt. No. 1), and Vargas's name first appears in the billing records prior to that date (on June 8 – June 21, 2011), Vargas was not named as a defendant until the first amended complaint, filed on March 23, 2012.  (Dkt. No. 23).  The Court will not speculate about Plaintiff's decision to wait in bringing allegations against Vargas.  Still, it is not clear to the Court how Plaintiff's counsel was aware of Vargas in June of 2011 when the affidavit of William Belmont avers that he was retained by Plaintiff to investigate the counterfeit scheme in or about July of 2011, and did not confirm facts suggesting Vargas's involvement until January of 2012.  (See Belmont Aff. at ¶¶ 4, 6.)

31

records involve work done with respect to Vargas, "the entries are not sufficiently clear to enable the Court to determine how much time was spent on other tasks in order to credit some portion of those time entries." Id.

Further, multiple entries in the billing records—including the June 8-June 21, 2011 entry that first mentions Vargas—are impermissibly vague in that they do not reflect a specific date on which the tasks took place, but rather give a range of dates and list various tasks that occurred during that time period. See e.g., Carey, 711 F.2d at 1148 (billing records must include *date*, hours expended, and nature of work done) (emphasis added); Lucerne Textiles, 2013 WL 174226, at *8 ("[T]he Court may reduce the fees requested for billing entries that are vague and do not sufficiently demonstrate what counsel did.") (citing cases). Morever, the first billing record referring to Vargas includes three other tasks that do not relate to Vargas: "further review and revision supporting affidavits including drafting affidavit for Franco Rivas; follow up with Castillo and client re Castillo sales figures; review and correspondence with client re list of potential defendants and related matters...." Dkt. No. 69-11, at 2. Accordingly, because this time entry is vague and "commingle[s] various activities, it is impossible for the Court to determine how much time was spent on a specific task and credit some portion" of the entry, and therefore, the Court recommends no fee award for this billing entry. Entral, 2007 WL 2891419, at *11.[16]

After the June 8-June 21 entry, the billing records for Plaintiff's counsel do not bear any relation to Vargas until October 13, 2011, when the records indicate that Ms. McLaughlin spoke

---

[16] This practice, known as "block billing" – a practice wherein multiple tasks are listed in a single block of time, without explaining how long each task took to complete – is disfavored in the Southern District and further supports a reduction in hours in Plaintiff's overall request. See, e.g., Romeo and Juliette Laser Hair Removal, Inc. v. Assara I, LLC, No. 08 Civ. 442 (TPG) (FM), 2013 WL 3322249, at *7 (S.D.N.Y. July 2, 2013) (citing cases).

to "Bill Belmont regarding [a] new investigation assignment." Dkt. No. 69-11, at 6. Thus, fees from June 8 until October 13, 2011 are also unavailable to Plaintiff on this motion. See Entral, 2007 WL 2891419, at *11; Colon, 2012 WL 691544, at *22.[17] From October 13, 2011 to November 15, 2011, most of the billing records reflect tasks relating to the counterfeit investigation, which, as noted above, did produce information relating to Vargas's counterfeiting activities. Dkt. No. 69-11, at 6-7. However, given that the results of the investigation were used to discover various aspects of the counterfeit scheme that were unrelated to Vargas and to bolster Plaintiff's claims against the host of other defendants, counsel should not be entitled to receive the entirety of the fees sought for such activities: $2,475.[18] Instead, because the overwhelming majority of counsels' time was devoted to performing tasks related to the other purported infringers, the Court, in its discretion, recommends awarding 10% of fees sought during this period for a total of $247.50.

The Court arrives at this 10% figure by noting that Plaintiff has either entered into consent injunctions or dismissed claims against all of the other defendants besides Vargas. Fourteen defendants entered into a consent injunction on April 3, 2012; three more entered into

---

[17] Billing records from this period (in addition to entries from earlier dates) indicate that Plaintiff's counsel was preparing the Kessler, Franco Rivas, and Sigmundo Rivas affidavits. As Plaintiff acknowledges, these affidavits were originally drafted for the purpose of moving for a temporary restraining order, order of seizure, preliminary injunction, and expedited discovery in 2011, prior to naming Vargas as a defendant in this action. Pl. Mem. at 4 n.1. The affidavits are dated August and September of 2011 (around the time of the filing of the original complaint) and the captions do not include Vargas as a defendant. See Affidavits of Sigmundo Rivas, Franco Rivas, and Michael Kessler. (Dkt. Nos. 70-72). Although attached in support of Plaintiff's motion for default, the documents include no facts about Vargas or his role in the counterfeit scheme. Accordingly, Plaintiff should not be granted the fees associated with preparing these affidavits.

[18] This figure was calculated by subtracting the $750 billed on 9/19/2011-9/23/2011 from the total bill from the period from October 13, 2011 until November 15, 2011, $3,225. Dkt. No. 69-11, at 6-7.

another consent injunction on February 19, 2013; and four more defendants were voluntarily

dismissed on July 31, 2013. See Dkt. Nos. 30, 66, 77. Where only one defendant remains, it is

reasonable to apportion the fees for the time spent preparing Plaintiff's case against all

defendants. See Entral, 2007 WL 2891419, at *11 ("Time spent preparing plaintiff's case

against other defendants in addition to the defaulting defendants should be apportioned equally

between all the defendants."); Lyons P'ship, L.P. v. D&L Amusement & Entm't, 702 F. Supp.

2d 104, 122 (E.D.N.Y. 2010) (same); Merch. Media, LLC v. H.S.M. Int'l, No. 05 Civ. 2817,

2006 WL 3479022, at *13 (S.D.N.Y. Nov. 30, 2006) (approving reduction for fees "allocable to

legal work relating solely to the two defendants that were dismissed by the Court"). However,

because it is unclear exactly how many defendants were the subject of counsels' activities during

the various billing stages of this case (due in large part to the vagueness of the billing records),

and Plaintiff's counsel has not parsed the billing records in its submissions to the Court to shed

any light on this subject, the Court recommends awarding 10% of the fees sought for the times

during which counsel was preparing a case against multiple defendants.

During the time periods from November 17, 2011 to February 22, 2012 (for which fees

total $6690 (Dkt. No. 69-11, at 10-12, 16-17)), March 20 to March 23, 2012 (for which fees total

$1170 (id., at 18)), and May 3, 2012 to January 8, 2013 (for which fees total $9540 (id., at 20-

25)[19]), counsel's records reflect tasks that, in part, relate to Vargas, such as those concerning

---

[19] This number reflects a deduction of $420 because the entries for 10/1/2012-10/5/2012 and
10/25/2012-11/16/2012 are identical, except that the latter includes "consulting with DF re
service of Vargas." Dkt. No. 69-11, at 24. While it is true that Plaintiff's counsel may have
performed similar tasks in different time periods, the Court finds the entries both vague and
repetitive, particularly because the wording is *exactly* the same and both entries include the task:
"filing letter with Court on October 5, 2012." Id.

further investigations, drafting the amended complaint, and serving various defendants.[20] For reasons stated above, the Court recommends awarding 10% of the fees sought during these periods as it is unclear exactly how much work was done in furtherance of the claims that are specifically against Vargas. While some of counsel's notes do refer to Vargas, they are often included in the same time entry as other tasks that do not necessarily relate to Vargas. Indeed, while Plaintiff argues it is entitled to fees for legal services "that were necessary to the litigation of this action," none of those services are particular to Vargas and instead encompass tasks performed in pursuit of the case against multiple defendants. Wilshinsky Aff., ¶ 21. Accordingly, the Court recommends awarding 10% of the requested $17,400, or an additional $1,740, for this time period.

Plaintiff inexplicably does not seek attorneys' fees for the time spent preparing the instant motion for default, though Ms. Wilshinsky asserts that the cost of preparing both the "recently executed Consent Injunction and this motion for default . . . can be estimated at approximately $3000." Wilshinsky Aff., ¶ 20. Though Plaintiff may be entitled to fees associated with the motion for default, (see, e.g., Lyons, 702 F. Supp. 2d at 119 n.3), the Court does not recommend any such award, first, because it is impossible to tell which fees are attributable to the motion for default as opposed to the consent injunction (see, e.g., Entral, 2007 WL 2891419, at *11) and no specific itemized information is provided by Plaintiff's counsel, and second, because Plaintiff has made no request for such an award. Thus, I recommend awarding attorneys' fees to Plaintiff in the amount of $1,987.50 ($247.50 + $1,740).

---

[20] Entries from February 27-March 19 and March 28-April 3, 2012 detail time billed for a consent injunction and other tasks completely unrelated to Vargas and thus have been subtracted from the fee calculation. Dkt. 69-11, at 17-18.

35

b. Costs

Plaintiff states that it incurred costs in the amount of $6,839.79 for the general costs of litigation, "including, but not limited to, filing fees, photocopying, messenger service, postage charges, research fees, travel costs, service of process costs, clerical costs, product purchases and investigation-related fees and expenses." Wilshinsky Aff., ¶ 26. "These are the types of routine costs typically awarded when a defendant defaults." Louis Vuitton Malletier v. Artex Creative Int'l Corp., 687 F. Supp. 2d 347, 365 (S.D.N.Y. 2009) (citing Arbor Hill, 369 F.3d at 98)). Plaintiff also seeks reimbursement of $14,860 for the total cost of investigative services required to "root out the source and scope of the counterfeiting while learning the extent of the operation." Wilshinsky Aff., ¶ 28. Plaintiff's counsel has provided documentation of its investigative expenses and the Court agrees that such services were necessary to determine the extent of the counterfeit scheme, rendering some reimbursement for investigative fees appropriate. Chanel, Inc. v. Gardner, No. 07 Civ. 6679 (GBD) (MHD), 2011 WL 204911, at *6 (S.D.N.Y. Jan. 21, 2011) ("The Lanham Act provides that a court can award costs to a prevailing party who meets their burden of explaining and documenting their expenses."). However, given that Plaintiff's costs were derived largely from actions taken with respect to various defendants other than Vargas, for the reasons set forth above, I recommend awarding 10% of the costs sought, for a total of $2,169.98.

## III.   CONCLUSION

For all of the foregoing reasons, I recommend that the Court award Plaintiff statutory damages of $40,000 and fees and costs in the amount of $ 4,157.48 ($1,987.50 + $2,169.98), for a total of $44,157.48, and that a permanent injunction be entered as described above.

36

## PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to such objections,

shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the

Honorable Ronnie Abrams and to the chambers of the undersigned, United States Courthouse,

500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing

objections must be directed to Judge Abrams. **FAILURE TO FILE OBJECTIONS WITHIN**

**FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL**

**PRECLUDE APPELLATE REVIEW.** See Thomas v. Arn, 474 U.S. 140 (1985); Wagner &

Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92

(2d Cir. 2010); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


Dated: New York, New York
      November 12, 2013

JAMES L. COTT
United States Magistrate Judge